**RAYTHEON ENGINEERS & CONSTRUCTORS, INC., a Delaware corporation, Appellant,**

**v.**

**SARGENT ELECTRIC COMPANY, Ryerson Tull, Inc., a Delaware corporation, formerly Inland Steel Industries, Inc., and Ispat Inland, Inc., a corporation, formerly Inland Steel Company, Appellees.**

No. 45A04–0909–CV–524.

Court of Appeals of Indiana.

Aug. 6, 2010.

Edward W. Hearn, John R. Terpstra, Johnson & Bell, Ltd., Merrillville, IN, Attorneys for Appellant.

Robert Marc Chemers, Pretzel & Stouffer, Chartered, Chicago, IL, Attorney for Appellee Sargent Electric Company.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Raytheon Engineers and Constructors, Inc. ("Raytheon"), the third-party plaintiff in the trial court, appeals the trial court's grant of summary judgment to the third-party defendant, Sargent Electric Company ("Sargent").[1] Raytheon raises two issues for our review, which we consolidate and restate as whether the trial court erred when it granted Sargent's motion for summary judgment. We hold that Sargent did not breach its duty of care to Raytheon and that Raytheon is not entitled to indemnification from Sargent. Thus, we affirm the trial court's grant of summary judgment.

### FACTS AND PROCEDURAL HISTORY

On October 27, 1996, Raytheon entered into a contract with Indiana Harbor Coke Company ("Indiana Harbor") to engineer, procure, and construct a coke battery plant ("the construction project"). The plant was to be built on property owned by Inland Steel Company ("Inland Steel"), which Inland Steel leased to Indiana Harbor. At the time, Inland Steel was wholly owned by Inland Steel Industries, Inc. ("ISI"), but, in 1998, ISI sold Inland Steel and it was renamed Ispat Inland, Inc. ("Ispat Inland"). In early 1999, ISI merged with Ryerson Tull, Inc. ("Ryerson").

On March 17, 1997, Raytheon, the engineer and general contractor for the construction project, issued a requisition for four 225 kVA transformers. Those transformers were to have a "Wye Primary" and a "Wye Secondary" configuration (referred to as a "Wye–Wye" configuration). Appellant's App. at 767. The requisition for those transformers did not mention a "Delta" configuration. Among other differences, a Delta-configured transformer is

---

1. The plaintiffs in the trial court, Ryerson Tull, Inc. and Ispat Inland, Inc. have not filed briefs in this appeal.

not grounded while a Wye-configured transformer is grounded to a neutral. The requisitioned transformers were to be used "for temporary construction power." *Id.* (capitalization removed). At the time Raytheon issued its requisition, Inland Steel had technical engineering guidelines ("TEGs") in place "to provide the engineer with information to use when requisitioning products." *Id.* at 501. Here, the relevant TEG required the primary winding for transformers to be in the Delta configuration. *See id.* at 717.

On May 7, 1997, Raytheon hired Sargent as a subcontractor for electrical installation. Raytheon and Sargent entered into a written subcontract for Sargent to provide "the materials, equipment and labor" required to install temporary construction and start-up power for the construction project, which included installing the four requisitioned transformers. *Id.* at 788. Sargent "represent[ed] that it ha[d] independently examined the site of the Work, ha[d] investigated and considered all of the conditions affecting the execution of the Work, [and wa]s fully capable of performing the Work under said conditions...." *Id.* at 789. Sargent also represented that it had "full knowledge, ... experience and resources requisite for the timely and practical design, construction, and/or operation of the Work and agree[d] to apply such knowledge and experience in the execution of the Work." *Id.*

Although the subcontract was executed in May, Sargent had begun its work the preceding March. By April or May, Sargent had the 225 kVA transformers connected and energized. Sargent completed all of its work for the subcontract in July of 1997. At no point did Inland Steel or Raytheon inform Sargent of the TEG requirement that the transformers be Delta–Wye configured rather than Wye–Wye configured. Indeed, "Sargent was not in-

volved in preparing any of the specifications for the transformers that were used" in the construction project. *Id.* at 834. To the contrary, Sargent merely "hooked in" the transformers "[p]ursuant to the drawings and the requirements of the specification" that Raytheon provided to Sargent. *Id.* at 431.

Immediately after the completion of Sargent's work, Raytheon hired 200–300 electricians to maintain the temporary transformers installed by Sargent. That work included moving, relocating, and retiring those start-up transformers. In mid-March of 1998, Raytheon's electricians disconnected one of the 225 kVA transformers and stored it in an open field northwest of Raytheon's nearby offices.

On April 26, 1998, a 500 kVA transformer that was Delta–Wye configured failed at the site. Raytheon moved the disconnected 225 kVA transformer from its storage field to the location of the failed transformer. There, Raytheon connected the 225 kVA transformer in the same manner in which Sargent had originally connected that transformer. On July 3, an electrical power loss occurred at the site due to the improper installation of the Wye–Wye configured transformer at the location of the failed Delta–Wye configured transformer. That power loss caused a blast furnace to lose power and spill molten steel onto the property, which resulted in damages to Inland Steel in excess of $25,000,000.

Thereafter, Ryerson and Ispat Inland filed suit against Raytheon, alleging, in relevant part, that Raytheon had negligently connected the subject transformer. Raytheon filed a third-party complaint against Sargent, seeking contractual and common-law indemnification. Ryerson and Ispat Inland subsequently amended their complaint to include Sargent as a defendant.

On January 2, 2007, Sargent moved for summary judgment. On April 4, the trial court granted Sargent's motion with respect to both Raytheon's claims and Ryerson and Ispat Inland's claims. In May of 2009, Ryerson and Ispat Inland settled their claims against Raytheon. The trial court accepted their joint motion for dismissal with prejudice on August 14. Raytheon then timely appealed the trial court's entry of summary judgment for Sargent.

## DISCUSSION AND DECISION

Raytheon appeals the trial court's summary judgment for Sargent. Our standard of review for summary judgment appeals is well established:

> When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

*Dreaded. Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269–70 (Ind.2009) (citations omitted). The party appealing from a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. *Knoebel v. Clark County Superior Court No. 1*, 901 N.E.2d 529, 531–32 (Ind.Ct.App.2009). We will affirm a grant of summary judgment if sustainable on any theory found in the evidence designated to the trial court. *O'Brien v. 1st Source Bank*, 868 N.E.2d 903, 906 (Ind. Ct.App.2007).

Here, after Ryerson and Ispat Inland sued Raytheon, Raytheon filed a third-party complaint against Sargent alleging that any liability Raytheon may have to the plaintiffs was directly attributable to Sargent's negligent installation of the subject transformer. That is, Raytheon contended that because it had installed the 225 kVA transformer in the same manner in which Sargent had originally installed it, Sargent was the party ultimately responsible for the transformer's failure. In their subcontract, Raytheon and Sargent agreed that Sargent

> shall protect, hold free and harmless, defend and indemnify [Raytheon] and [Inland Steel] ... for all liability, penalties, costs, losses, damages, expenses, causes of action, claims or judgments ... resulting from ... damage to property of any kind, which ... damage arises out of or is in any way connected with the performance of the work under this Contract....: *except that said agreement shall not be applicable to ... damage to property arising from the sole negligence or willful misconduct of [Raytheon], [Inland Steel] ... or independent contractors (other than [Sargent]) who are directly responsible to[Raytheon] or [Inland Steel].*

Appellant's App. at 763 (emphasis added). In its motion for summary judgment, Sargent asserted that it did not act negligently in performing its contractual obligations to Raytheon and that any negligence in the

use of the subject transformer was solely attributable to Raytheon.

 Thus, on appeal the parties dispute whether a genuine issue of material fact precludes the entry of summary judgment for Sargent on the question of Sargent's purportedly negligent installation of the subject transformer.[2] Raytheon's burden of proving that Sargent acted with negligence is well settled:

> To prevail on a claim of negligence a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach. A negligent act is the proximate cause of an injury if the injury is a natural and probable consequence, which in light of the circumstances, should have been foreseen or anticipated.
>
> Summary judgment is rarely appropriate in negligence cases. Issues of negligence, contributory negligence, causation, and reasonable care are more appropriately left for the determination of a trier of fact. . . .

*Humphery v. Duke Energy Ind., Inc.*, 916 N.E.2d 287, 290–91 (Ind.Ct.App.2009) (quoting *Florio v. Tilley*, 875 N.E.2d 253, 255 (Ind.Ct.App.2007)).

 We agree with Sargent that it did not breach its duty of care to Raytheon or Inland Steel. Although breach of duty is generally a question of fact, it can be a question of law "where the facts are undisputed and only a single inference can be drawn from those facts." *N. Ind. Public Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind.2003). Further, "there is no breach of duty and consequently no negligence where a contractor merely follows the plans or specifications given him by the owner so long as they are not so obviously dangerous or defective that no reasonable contractor would follow them." *Peters v. Forster*, 804 N.E.2d 736, 742 (Ind.2004) (citing *Ross v. State*, 704 N.E.2d 141, 144–45 (Ind.Ct.App.1998)). As we explained in *Ross:* "[T]he contractor is not liable if he has merely carried out the plans, specifications, and directions given him, since in that case the responsibility is assumed by the employer, at least when the plans are not so obviously dangerous that no reasonable contractor would follow them."[3] 704 N.E.2d at 144–45 (alteration original; quotation omitted).

Sargent has made a prima facie showing that it did not breach its duties to Raytheon or Inland Steel. *See Dreaded, Inc.*, 904 N.E.2d at 1269–70. In its evidence designated to the trial court, Sargent showed that it merely followed the plans and specifications given to it by Raytheon. Specifically, Ferdinando Riva, Raytheon's project manager for the construction project, testified that Sargent merely "hooked in" the transformers "[p]ursuant to the drawings and the requirements of the specification" provided to Sargent by Raytheon. Appellant's App. at 431. Sargent

---

**2.** Raytheon also disputes whether the trial court improperly applied the "acceptance rule" in granting summary judgment to Sargent. *See Peters v. Forster*, 804 N.E.2d 736, 741–42 (Ind.2004) (abandoning the acceptance rule in favor of the "foreseeability doctrine"). But Sargent does not present that argument on appeal in defense of the trial court's judgment and we, therefore, do not consider it. *See* Ind. Appellate Rule 46(A)(8)(a). In addition, Sargent contends that the trial court properly entered summary judgment because Sargent owed no duty of care to Inland Steel. We do not address that contention either. Finally, neither party discusses Raytheon's claim of common law indemnification. It is also waived. *Id.*

**3.** Raytheon does not suggest that the law discussed in *Ross* and *Peters* does not apply to Sargent merely because of its status as a subcontractor.

also submitted the deposition of another Raytheon employee who testified that "Sargent was not involved in preparing any of the specifications for the transformers that were used" in the construction project. *Id.* at 834. Further, Sargent presented evidence that Raytheon, not Sargent, prepared the requisitions that erroneously described the Wye–Wye configured transformers. And while Raytheon was aware of Inland Steel's TEGs, Raytheon did not inform Sargent of Inland Steel's requirement that the transformers be Delta–Wye configured. In sum, Sargent had no involvement in drafting or preparing the specifications.

In response, Raytheon contends that "Sargent should have known that Inland Steel's electrical system was a Delta system." Appellant's Br. at 19. In support, Raytheon refers to the "history of [Sargent and Inland Steel's] relationship." *Id.* Specifically, Raytheon identifies from the designated evidence the depositions of six Sargent employees. According to Raytheon, those depositions show that Sargent had specific knowledge that the installation of Wye–Wye configured transformers on Inland Steel's property was unreasonably dangerous. We address the testimony of each of the six identified deponents in turn.

Raytheon mischaracterizes the evidence. One witness identified by Raytheon, Nick Warona, testified that he had performed work at Inland Steel's site in the past. However, he specifically stated that, in doing so, he never received "any type of specification or guidelines for connection of transformers to its electrical system." Appellant's App. at 1097. Another, Donald Newcomb, also expressly stated that no information he reviewed for the construction project "specified that a Delta–Wye, Wye–Wye, Wye–Delta, or Delta–Delta transformer" must be used at the site. *Id.*

at 889. A third witness, Paul Brown, testified that Sargent had never received a copy of Inland Steel's TEGs either for this project or for prior projects Sargent had done at the site. *Id.* at 584.

Raytheon also cites Sargent employee Lawrence Chapman's testimony for the proposition that Sargent knew "that Inland Steel's electrical system is a 'Delta' system." Appellant's Br. at 21. The relevant part of Chapman's testimony is as follows:

Q. What is your understanding as to what kind of system Inland Steel's was?

A. I have no idea. I never got into that.

Q. You don't know if it was Delta or Wye?

A. No.

Q. You testified that the tower you were working with had no neutrals, right?

A. Right. They got [sic] statics, but no neutrals.

Q. Does that tell you anything about whether it is a Delta system or a Wye system?

A. Delta.

Appellant's App. at 1056. At best, Chapman's testimony on this point is equivocal. But any attempt to construe that portion of the testimony as a genuine issue of material fact is obviated by Chapman's ensuing statements. Chapman went on to testify that he thought a Delta-configured transformer could be changed over to a Wye-configured transformer by simply adding a neutral line, and that he had "no idea" whether doing so "would [a]ffect the system in any ... way." *Id.* That question, according to Chapman, was "more of an engineering type of question" than an electrical one. *Id.* at 1071. Thus, nothing about Chapman's testimony suggests that

Raytheon's design specifications were so obviously dangerous that no reasonable electrician would follow them.

Raytheon also relies on the testimony of Sargent employee Wayne Oosterhoff. Oosterhoff testified that it was possible his supervisor for either the construction project or some prior, unrelated project at the site may have "mentioned the Inland Steel standards [and] specs," but he could not recall any specific detail about such a conversation or whether Sargent was specifically aware of Inland Steel's Delta-configuration requirement. *Id.* at 1141–42. Oosterhoff also testified that, while the drawing of the general layout of the site showed a Delta electrical system, he did not use that drawing in connecting the subject transformer. *Id.* at 1142–44. Rather, in doing that work, he used the more specific wiring diagrams found on the name plates of the transformers themselves, which specified a Wye–Wye configuration. *Id.* And Oosterhoff testified that it was not his responsibility "to evaluate the appropriateness of the transformer[s] for the project"; rather, that responsibility belonged to "the customer," Raytheon. *Id.* at 1144. Similarly, Warona testified that he would not have thought twice about grounding a transformer at Inland Steel's site if the main plate instructed as much. *See id.* at 1100.

Finally, Raytheon identifies the testimony of Sargent employee Roy Samuels for the proposition that Sargent knew not to ground a primary/high voltage winding. Samuels did testify that "you don't hook high voltage to ground." *Id.* at 1183. But, again, Raytheon's identification of that statement lacks context. In context, Samuels testified as follows:

Q. Okay. . . . Do you know if you have a high voltage transformer that has a grounding strap connecting the neutral terminals to the primary side and the secondary side, and if the secondary side is grounded, does that scenario necessarily ground the primary side?

A. I've never seen that done.

Q. Is it fair to say you don't know?

A. You're going to have to put that in there, yeah. I would never hook one up that way. Let me make that clear.

Q. Why would you not do that?

A. It's not—you don't hook high voltage to ground.

\* \* \*

Q. Do you know the reason?

A. I'm not an engineer, but I wouldn't do it to ground. Safety reasons.

\* \* \*

A. . . . I said I would not hook up a high voltage connection to ground for safety reasons—

Q. Right.

A. —that's my opinion. I have—I don't build the transformers. I'm not the technician.

Q. Okay.

A. It's just we don't do that normally. This is just . . . I wouldn't hook it up that way . . . unless specifically someone told me otherwise.

*Id.* at 1182–83. Thus, the context of Samuels' testimony is that high voltage is not normally grounded, but, not being an engineer, he would do so if instructed. That intent is made even more clear later in Samuels' deposition:

Sometimes when you're on a job they tell you 'this is what I want you to do.' You just do your job and you don't question whether it's the right [thing], and fill in the blank of all the things that could be wrong.

You know, I don't know what the voltage should be output [sic]. I don't know what the capacity of the transformer in

amps [should be]. I don't know if the weight is at its specification, that's not my concern. My concern was: Hook this cable up. And that's it.

*Id.* at 1190.

In sum, none of the deponents identified by Raytheon testified that Sargent was not merely following the plans and specifications given to it by Raytheon. Neither does any of their testimony demonstrate that Raytheon's plans were so obviously dangerous that no reasonable electrician would follow them. In other words, Raytheon has not met its burden of showing a genuine issue of material fact on the question of whether Sargent breached its duty of care under the subcontract. *See Dreaded, Inc.* 904 N.E.2d at 1269–70.

Thus, we hold that Sargent did not breach its duty of care to Raytheon or Inland Steel. *See Peters,* 804 N.E.2d at 742 (citing *Ross,* 704 N.E.2d at 144–45). To the contrary, Sargent merely followed the plans and specifications Raytheon provided, and those plans were not so obviously dangerous that no reasonable electrician would not have followed them. Further, given our determination that Sargent did not negligently install the subject transformer, we also hold that Raytheon is not entitled to indemnification from Sargent under the terms of the subcontract. Again, the subcontract's indemnification clause does not require Sargent to indemnify Raytheon when the property damage "aris[es] from the sole negligence or willful misconduct of [Raytheon.]" Appellant's App. at 763. Accordingly, the trial court did not err when it granted summary judgment to Sargent.

Affirmed.

VAIDIK, J., and BROWN, J., concur.